# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Steven M. Traut Wells, Inc. d/b/a/ Traut Wells, and Kent Busek, individually, and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| American Airlines Group Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., United Continental Holdings, Inc., and United Airlines, Inc., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Steven M. Traut Wells, Inc. d/b/a/ Traut Wells, and Kent Busek ("Plaintiffs"), through their undersigned attorneys, brings this action individually and on behalf of all others similarly situated against Defendants American Airlines Group Inc., American Airlines, Inc. Delta Air Lines, Inc., United Continental Holdings, Inc., United Airlines, Inc. and Southwest Airlines Co. (collectively "Defendants") and allege as follows:

## I.   NATURE OF THE CASE

1.      Plaintiffs bring this class action against Defendants for conspiring to fix, raise, maintain and/or stabilize the price of domestic air travel services in violation of Section 1of the Sherman Antitrust Act.  Plaintiffs  bring this action on behalf of themselves and all persons and entities who directly purchased  domestic air travel services from Defendants, their co-conspirators, and/or any subsidiaries or affiliates  thereof between January 1, 2010 and the present (the "Class  Period").

2.      Following a series of mergers, Defendants American, Delta, United and Southwest now control at least 80% of the domestic flights in the United States.  Defendants have taken advantage of this recent consolidation to collusively impose "capacity discipline" in the form of limiting flights and seats despite increased demand and lower costs, particularly in the form of jet fuel costs, which make up a significant portion of Defendants' costs.

3.      Defendants' collusion has resulted in supra-competitive prices for domestic air travel services, and record profits for Defendants.

4.      Defendants have implemented and policed their illegal agreement through public signaling of future capacity restrictions and publically imploring each other to limit capacity increases.  Upon information and belief, Defendants have also secretly communicated with another, including via trade associations.

5.      As alleged herein, Defendants entered into an illegal agreement, combination, or  conspiracy to raise and maintain the price of domestic air travel services in the United States.  As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class paid higher prices for  domestic air travel services than they would have paid in a competitive market.

## II.      **PARTIES**

### A.      **Plaintiffs**

6.      Plaintiff Steven M. Traut Wells, Inc. d/b/a/ Traut Wells ("Traut Wells") is a corporation doing business in the state of Minnesota.  During the Class Period, Traut Wells purchased multiple round-trip tickets for business purposes from MSP to Las Vegas, Nevada

on Delta.  As a result of the violations alleged in this Complaint, Traut Wells suffered

antitrust injury.

7.      Plaintiff Kent Busek ("Busek") is an individual residing in the state of North

Dakota.  During the Class Period, Busek purchased round trip tickets for himself and four

family members from Fargo, North Dakota to Sacramento, California, with layovers in MSP

and Los Angeles ("LAX"), from Defendant Delta.  Busek purchased other airfare tickets

during the Class Period from Defendants.  As a result of the violations alleged in this

Complaint, Busek suffered antitrust injury.

**B.      Defendants**

**American**

8.      Defendant American Airlines, Inc. is a Delaware corporation with its

principal place of business located in Fort Worth, Texas.

9.      Defendant American Airlines Group Inc. is a holding company and the

parent  company of Defendant American Airlines, Inc.  Defendants American Airlines

Group Inc. and  American Airlines, Inc. are collectively referred to herein as "American".

10.      American was formed in December 2013 as a result of the merger of AMR

Corporation, the previous parent company of American Airlines, and US Airways Group,

the  previous parent company of US Airways.  The new American is the largest airline in

the world,  operating nearly 6,700 flights per day to 339 locations in 54 countries.

11.      During the Class Period, American, either directly or through its

subsidiaries and/or affiliates, sold domestic air travel services throughout the United

States at artificially inflated levels as alleged herein.

3

**Delta**

12.     Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business located in Atlanta, Georgia.  Delta is the oldest operating airline in the  United States (founded in 1924) and operates more than 5,400 flights per day to 326 locations in  64 countries.   In 2008, Delta merged with Northwest Airlines. Northwest Airlines was headquartered in Eagan, Minnesota.  Although, the merged entity is headquartered in Georgia, Delta maintains significant operations in Minnesota.

13.     During the Class Period, Delta, either directly or through its subsidiaries and/or affiliates, sold domestic air travel services throughout the United States at artificially inflated levels as alleged herein.

**Southwest**

14.     Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its  principal place of business located in Dallas, Texas.  Southwest carries the most domestic  passengers of any U.S. airline and operates more than 3,600 flights per day to 94 locations in the  United States and six additional countries.

15.     During the Class Period, Southwest, either directly or through its subsidiaries and/or affiliates, sold domestic air travel services throughout the United States at artificially inflated levels as alleged herein.

**United**

16.     Defendant United Airlines, Inc. is a Delaware company with its principle place of business in Illinois.

17.     Defendant United Continental Holdings, Inc. is a Delaware holding company with its principle place of business in Illinois and the parent company of Defendant United Airlines. Inc.  Defendants United Continental Holdings, Inc. and United Airlines, Inc. are collectively referred to herein as "United."

18.     United offers service to more destinations than any other airline in the world, operating more than 5,300 flights per day to 369 locations across six continents.

19.     During the Class Period, United, either directly or through its subsidiaries and/or affiliates, sold air passenger transportation services throughout the United States at artificially inflated levels as alleged herein.

### III.      UNNAMED CO-CONSPIRATORS

20.     On information and belief, at all relevant times, other airlines, entities, and/or persons, including, but not limited to, US Airways (prior to its merger with American Airlines) willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

### IV.      AGENTS

21.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

### V.      JURISDICTION AND VENUE

22.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15

U.S.C. §§ 15 and 26) to obtain injunctive relief and treble damages, as well as reasonable attorneys' fees and costs, arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

23.     This Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

24.     Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) and 28 U.S.C. § 1391(b) and (c), because all of the Defendants transact business in this district, and a substantial portion of the affected interstate trade and commerce was carried out in this district. All of the defendants sell domestic air travel services into and out of MSP, as well as, to residents of this District.  Defendant Delta maintains offices in this District and employees thousands of individuals in this District.  MSP is Delta's third largest hub.  Plaintiffs each purchased flights originating from or with stops at MSP, which is located in this District.

25.     Defendants are subject to the personal jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with this District.

## VI.   <u>CLASS ACTION ALLEGATIONS</u>

26.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

All persons and entities who purchased domestic air travel services for flights within the United States directly from one or more Defendants, or any of predecessor, subsidiary or affiliate thereof, between January 1, 2010 and the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, and all governmental entities.

27.     The exact number of Class Members is unknown to Plaintiffs because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, Plaintiffs believe that there are likely millions of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

28.     Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of the Class because each Plaintiff purchased domestic air travel services directly from one or more Defendants or their co-conspirators.  As a result, Plaintiffs and all Class Members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein and the relief sought is common to the Class.

29.     There are numerous questions of law or fact common to the Class, including but not limited to:

a.      whether Defendants combined or conspired to fix, raise, maintain, or stabilize the price of domestic airfare in the United States;

b.      whether Defendants combined or conspired to restrict the capacity of domestic flight seats sold in the United States;

c.      whether Defendants shared non-public information, allocated markets and customers, restricted the supply of seats sold on domestic flights in the

7

United States, and  committed other anticompetitive conduct in furtherance of the alleged

conspiracy;

       d.     whether Defendants' public statements signaled other competitors or

demonstration coordination with competitors;

       e.     whether Defendants' conduct caused the prices of domestic airfare in

the  United States to be at artificially high and noncompetitive levels;

       f.     whether Plaintiffs and the other members of the Class were injured

by  Defendants' conduct, and, if so, the appropriate classwide measure of damages for

Class  Members; and

       g.     whether Plaintiffs and the other members of the Class are entitled to,

among other things, injunctive relief, and, if so, the nature and extent of such injunctive

relief.

     30.    These and other questions of law and fact are common to the Class, and

predominate over any questions affecting only individual Class Members, including

legal and factual issues relating to liability and damages.

     31.    Plaintiffs will fairly and adequately represent the interests of the Class in

that Plaintiffs are direct purchasers of one or more domestic flight(s) and have no

conflict with any other members of the Class.  Plaintiffs have retained competent

counsel experienced in antitrust, class action, and other complex litigation who have

litigated innumerable class actions, including in the air transportation industry.

     32.    Defendants' conduct was generally applicable to the Class, thereby

making final injunctive relief appropriate with respect to the Class as a whole.

33.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  There will be no material difficulty in the management of this action as a class action.  Class treatment will also permit the adjudication of relatively small claims by class members who otherwise could not afford to litigate an antitrust claim such as that asserted herein.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender.

34.     The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying judgments, establishing incompatible standards of law for Defendants.

35.     The Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators, as Defendant should have electronic records of all tickets purchased, which required identification of passengers and payer.

### VII.     FACTUAL ALLEGATIONS

**A.     Airline Consolidation Creates a Tight Oligopoly Facilitating Collusion**

36.     The Airline Deregulation Act ("ADA"), passed in 1978, deregulated the domestic airline industry  removing government control over fares, routes, and market entry of new airlines.  The purpose of the ADA was to allow market forces, rather than

the government, to guide the domestic airline industry with the goal of creating a competitive marketplace for the purchase of the airlines' services. After the passage of the ADA, Defendants competed over fares, routes, and seats.

37.     However, more recently the airline industry has experienced significant consolidation, leading to fewer competitors, and a market ripe for anticompetitive coordination. As alleged in detail below, Defendants have taken advantage of these conditions and engaged in implicit and explicit coordination in violation of the antitrust laws with respect to domestic air travel services.

38.     Prior to the Class Period, the airlines suffered from several years of  poor financial performance. According to industry trade group Airlines for America, U.S. airlines' average net profit margin was nearly -4% from 2001-2010, compared with a positive net margin of nearly 2% from 1991-2000. This historically poor performance immediately prior to the Class Period incentivized Defendants to artificially inflate prices for domestic air travel services, primarily via coordinated capacity reductions.

39.     The domestic airline passenger market has experienced extensive consolidation. In 1999, the four largest airlines controlled 60% of the domestic airline passenger market. Following  a series of mergers, Defendants American, Delta, United and Southwest now control approximately 80% of the domestic air passenger market:



40.     In 2005, there were nine major airlines. That year, US Airways and America West merged, taking the name US Airways. In 2008, Delta and Northwest Airlines merged, taking the name Delta. Two years later, in 2010, United and Continental merged, taking the name United. In 2011, Southwest and AirTran merged, taking the name Southwest.

41.     In early 2013, American and US Airways announced an $11 billion merger.  The DOJ filed an antitrust lawsuit alleging that US Airways' acquisition of American would have substantially lessened competition for commercial air travel in local markets throughout the United States. The complaint warned that the merger of American and US Airways "would make it easier for the remaining airlines to cooperate, rather than compete, on price and service." DOJ Compl. ¶ 3. It noted that the

"structure of the airline industry is already conductive to coordinated behavior: Few large players dominate the industry; each transaction is small; and most pricing is readily transparent." Id. ¶ 41.

42.     The DOJ has also revealed previous direct communications between airline CEO's in contravention of the antitrust laws, citing as an example the following exchange between US Airways' CEO (US Airways is now part of Defendant American) and the CEO of a rival airline:

> US Airways also has communicated directly with a competitor when it was upset by that competitor's efforts to compete more aggressively. In 2010, one of US Airways' larger rivals extended a "triple miles" promotion that set off a market share battle among legacy carriers. The rival airline was also expanding into new markets and was rumored to be returning planes to its fleet that had been mothballed during the recession. US Airways' CEO complained about these aggressive maneuvers, stating to his senior executives that such actions were "hurting [the rival airline's] profitability – and unfortunately everyone else's." US Airways' senior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of the industry. In that email thread, US Airways' CEO urged the other executives to "portray[ ] these guys as idiots to Wall Street and anyone else who'll listen." Ultimately, to make sure the message was received, US Airways' CEO forwarded the email chain — and its candid discussion about how aggressive competition would be bad for the industry — directly to the CEO of the rival airline. (The rival's CEO immediately responded that it was an inappropriate communication that he was referring to his general counsel.)

43.     The DOJ cited to an internal US Airway presentation that concluded that industry consolidation has resulted in "Fewer and Larger Competitors." The structural change to "fewer and larger competitors" allowed "[t]he industry" to "reap the benefits." Those benefits to the industry were touted in the same presentation as

including "capacity reductions."

44.     The companies eventually entered into a settlement with the DOJ that required the airlines to divest slots, gates and ground facilities at key airports around the country. Following the settlement, American and US Airways completed their merger in December 2013 becoming the world's largest airline.

45.     Prior to the American-US Airways merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, the new American quashed that plan, choosing instead to follow the rest of the industry in exercising "capacity discipline."

46.     This increased consolidation has hurt airline passengers.  Defendants have taken advantage of this consolidated market for domestic air travel services, acting in unison to: artificially raise fares, add new and/or increased fees for ancillary services, reduce capacity, and offer diminished service.

## B.   Defendants Coordinated and Signaled Capacity Reductions to Raise Ticket Prices

47.     As predicted in the DOJ's lawsuit challenging the American-US Airways merger, consolidation in the domestic air travel services industry created a market ripe for collusion and Defendants wasted no time taking advantage of this situation under the euphemism of "capacity discipline."  Fiona Scott Morton, an economics professor at Yale and a former deputy attorney general in the DOJ's antitrust division stated, "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity.  And when there aren't enough seats, airlines raise prices.

That's what we've been seeing."

48.     According to Reuters, an antitrust expert who asked not to be identified to protect business relationships stated, "The word 'discipline' is a no no. It's one of the words you don't use. It's like 101 in compliance."

http://www.reuters.com/article/2015/07/02/us-usa-airlines-collusion-idUSKCN0PC2HT20150702

49.     Throughout the Class Period, Defendants coordinated and signaled capacity reductions.

50.     In a competitive market, where competitors do not know each other's future plans, it would not be in one airline's unilateral self-interest to inform their competitor of a capacity discipline, for fear the competing airline would increase to capacity to gain market share.  In the face of rising demand, it would also not be in an airlines' unilateral self-interest to exercise discipline at all, for fear of a competitor would not exercise the same discipline and instead increase capacity to gain market share.

51.     The airlines' blatant public coordination and signaling of capacity discipline, as further described below, demonstrates the airlines were operating in concert.

52.     From June 7-9, 2015, the International Air Transport Association ("IATA") held its annual meeting in Miami, attended by the world's top airline executives.   IATA has frequently been a vehicle for collusion as demonstrated in In re

Air Cargo Shipping Services Antitrust Litigation, MDL No. 1775 (E.D.N.Y.), and In re Transpacific Air Antitrust Litigation ("Transpacific Air"), MDL No. 1913 (N.D. Cal.) antitrust class actions against the airlines.

53.     As the New York Times reported in an article titled "'Discipline' for Airlines, Pain for Fliers" published on June 11, 2015, many of the competitors at this meeting, including Defendants, publicly discussed their strategies to remain "disciplined" in capacity decisions.

54.     For example, at the meeting, Delta's president, Ed Bastian, stated that Delta is "continuing with the discipline that the marketplace is expecting."

55.     Air Canada's chief executive, Calin Rovinescu, stated, "People were undisciplined in the past, but they will be more disciplined this time."

56.     American's chief executive, Doug Parker, stated that the airlines had learned their lessons from past price wars and that, "I think everybody in the industry understands that."

57.     Prior to the IATA Annual Meeting, on May 20, 2015 Gary C. Kelly ("Kelly"), the CEO of Southwest, announced a break in this industry front, saying that Southwest planned to increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field, Dallas. The industry reaction was instantaneous. The stock prices of the other Defendant airlines plummeted. "Understandably, investors are questioning if this signals the end of the era of industry capacity discipline," Raymond James analyst Savanthi Syth wrote in a research note. Similarly, Wolfe Research airline

analyst Hunter Keay said that "[d]omestic capacity discipline has effectively vanished."

58.     The calls for discipline by airline executives and the pressure placed on Southwest at the IATA Annual Meeting had the desired effect. The New York Times article cited above reported that "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue. 'We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth…' Kelly said."

59.     Defendants' signaling of their intent to exercise "capacity discipline" at the IATA Annual Meeting was just one in a long-series of such signaling.  Throughout the Class Period, Defendants have publically signaled their company's plans to exercise capacity discipline.  In particular, Defendants utilized earnings calls and other investor calls to signal their support for their illicit agreement.  Defendants were aware that employees of their competitors were likely to be listening in on the calls.  The transcripts of the calls were also made publically available for competitors to access.

60.     On Delta 2010 First Quarter earnings call, Delta CEO Richard Anderson stated, "We will continue to be disciplined about capacity… We also believe capacity discipline is pretty important. We're committed to keeping capacity in check… Our results in the March quarter demonstrate our disciplined approach to cost on a 4% reduction in capacity."

61.     On the Delta 2010 second quarter earnings call, Anderson stated, "That leads us to overall capacity. This quarter, our system capacity was down 0.6%. For the

full year 2010, we anticipate system capacity to be up 1% to 1.5% and for the full year

of 2011, we are budgeting capacity to be up about 1% to 3% for the system. So we will

maintain capacity discipline and keep our non-fuel CASM roughly flat."  Later in

response to a question from Gary Chase, Analyst at Barclays Capital, about future

capacity outlook, Delta President Ed Bastian responds, "So no, I don't think there's any

change in our thinking about capacity in the least. And it's really the reason we gave the

2011 capacity, to show that we are expecting to maintain significant discipline and

restraint in the low single digits, which is what we have indicated in the past."

Anderson chimed in after Bastian that, "I think the capacity discipline is continuing."

  62. On Delta's 2010 third quarter earnings call Anderson reported, "Delta's

December quarter capacity this year will be down 5% versus 2007, down 1% from

2008, and so we will continue that sort of capacity discipline as we go forward."  Later

in the call Bastian stated, "…we remain firmly committed to capacity discipline, and as

evidence, the current December quarter will still be down 5% from 2007 levels and in

line with overall industry trends over that period.  For the domestic business, certainly

the part of the business with the greatest sensitivity to capacity levels, our December

quarter capacity will be down 10% from December quarter of 2007, which in fact is

greater than the overall industry's domestic reduction of 6.7% . . . As you can see, we

remain committed to keeping our capacity discipline in check and our capacity growth

within GDP rates.

  63. On the same Delta 3Q 2010 earnings call, analyst Jamie Baker of JP

Morgan asks, "Richard, the term discipline is increasingly used when discussing the industry… As concisely as possible, can you provide your definition of discipline? Anderson responds, "… So basically, you keep up with demand, don't worry about chasing share, but instead focus on operating, what is going to increase the operating margin of the Company."  Only market participants who have agreed not to compete are able to not "worry about chasing share."

64.     On the Delta 2010 fourth quarter earnings call, Anderson "We showed capacity discipline limiting our all-in capacity growth for 2010 at 1% with unit revenues up 12%."  Dan McKenzie, of Hudson Securities Analysts inquired, "…the specific worry just looking at first quarter is that capacity being redeployed by Delta and the industry into the larger markets like New York, Los Angeles and even Atlanta may dampen pricing and revenues in the markets that matter most. So my question is, what data points are you looking at that we cannot see that would justify some of the capacity increases we are seeing into these bigger markets? I guess I'm wondering if you can provide some more demand data points with what you are seeing or whether you think the industry is ultimately going to need to cut capacity here."  Bastian responds stating among other things, "So I think we are being pretty responsible with respect to discipline and management capacity."

65.     On the Delta 2011 first quarter earnings call, Hank Halter, Delta SVP & CFO states, "We are exercising discipline with our cost, capacity and capital."

66.     On the United 2011 third quarter earnings call, Jim Compton Chief

Revenue Officer of United, in response to question from Duane Pfennigwerth of

Evercore Partners, Inc. about United's revenue growth outstripping GDP responded:

"So again, I think our capacity discipline, as well as the industry discipline, what we've

seen, I think, we've done a good job of not -- the traffic that we're missing is the low

yield price-sensitive traffic and we're doing a good job of not diluting the higher-end

traffic. And I think the capacity discipline has allowed us to do that. And I think that's

probably the biggest difference in terms of breaking that GDP versus revenue growth

that you mention.  Compton later stated, "As with prior quarters this year, yield growth

and capacity discipline drove United's third quarter revenue results."

  67. On the Delta 2011 third quarter earnings call, Anderson affirms that

capacity discipline is a key strategy for profitability, signaling Delta' future capacity

plans: "We will be disciplined in capacity. We trimmed our December quarter capacity

by 4% to 5% year on year, with the trans-Atlantic down 10% to 12%, which is

particularly important given the unrest in Europe. And those capacity cuts will roll

forward into 2012. We're planning for 2012 capacity to be down 2% to 3% when

compared to 2011."

  68. On November 15-16, 2011 Paul Jacobson, SVP & Treasurer of Delta,

Gerry Laderman SVP- Finance & Treasurer of United Derrick Kerr, CFO US Airways

(later Exeutive VP and CFO of America post-merger) attended and were speakers at the

Citigroup 2011 North American Credit Conference.  Laderman's speech directly

followed Kerr's speech.  Kerr stated to his competitors and other conference attendees,

"I think there are 3 main reasons why the industry is doing well. The consolidation that has happened over the last 5 years, capacity discipline and also, the a la carte revenues that have been put in place [ie bag and reservation fees] . . . Going forward, I mean the key is, and the question I get all the time, are people going to keep the capacity discipline that is in place today? . . . And every announcement I have seen from a capacity perspective is down or minimal growth in 2012, which is key for the industry that everybody is keeping the capacity discipline that we need to continue to make the industry profitable. . . So it's not the same industry that we've had in the past. There's been a lot of things going on since 2008. We've been forced as an industry to change. The consolidation has forced a lot of that. Capacity discipline, which we're going to maintain that capacity discipline that looks through 2012."

69.     On the United 2011 fourth quarter earnings call, Compton stated, "This is an excellent full year result for the domestic mainline entity. Fares throughout the year remain higher due to successful fare increases, industry wide capacity discipline and early network optimization from our merger."

70.     On the Delta 2011 fourth quarter earnings call, Anderson lists capacity discipline as a reason why December was most profitable in Delta history.  Anderson concluded his remarks by stating Delta would be "taking a disciplined approach to capacity."

71.     On the US Airways 2011 fourth quarter earnings call, Kerr reports, Q4 2011 Derrick J. Kerr "Mainline passenger revenues were $2.05 billion, up 11.3%,

driven by higher yields as a result of the strong pricing environment and industry capacity discipline."

72.     For example, during a 2011 interview with Fortune Magazine, United's chairman, president, and chief executive, Jeff Smisek, stated what the recession taught United:

> "What we learned is the importance of capacity discipline. Ours has been an industry where it's very easy to add seats, through increased frequencies, flying the aircraft longer, or taking delivery of additional aircraft.  In the recession we  were very disciplined in getting our capacity down, and as we saw the recovery  with high fuel prices, we've been very disciplined at United and across the  industry in making sure we've got the right level of capacity and not supplying  overcapacity, driving down pricing."

73.     On the US Airways 2012 first quarter earnings call Kerr reported that, "Mainline passenger revenues were $2.1 billion, up 11.4% as a result of the strong pricing environment and continued industry capacity discipline."

74.     On the Delta 2012 first quarter earnings call Anderson, "You've heard us consistently state that we must be disciplined with capacity. To that end, our March quarter capacity was down by 3%, and for the full year, our system capacity will be down 2% to 3%. We continue to closely monitor all of our markets and for that matter, all of our city pairs to be certain we match supply to demand so that we may fully cover fuel costs and meet our profit goals."

75.     On the same 2012 1Q call, Bastian reported, "During the quarter, we saw strong unit revenue trends across all our entities, driven by our capacity discipline, corporate bookings strength, and the benefits from the investments we have been

making in products and services. Our domestic unit revenues increased 12% against a 3% decline in capacity. Our Detroit/Minneapolis hubs performed particularly well and we are seeing strength in our high yield, close in bookings."  Similarly, Glen Hauenstein, Executive Vice President of Network Planning & Revenue Management at Delta, in response to an analyst question about capacity cuts stated, "Well, I think our revenue performance is attributable to two factors. One is capacity discipline…"

76.    On the United 2012 second quarter earnings call, Compton not only reaffirmed United's commitment to capacity discipline, but also gave 5-year United capacity plans: "We remain committed to capacity discipline to generate sustained and sufficient profitability. Our second quarter consolidated capacity decreased 0.6% year-over-year. Although the cost of jet fuel came down, we recognize that jet fuel prices are very volatile, and we continue our commitment to capacity discipline . . . Importantly, we recognize the benefit capacity discipline brings, and we are not going to depart from the strategy.  Between our mainline and regional fleet, we have about 1,250 aircraft today. Over our planning horizon of the next 5 years, we intend to keep our fleet count roughly flat."

77.    On the Delta 2012 second quarter earnings call, Anderson proclaimed that, "Capacity discipline is our key lever. We will continue to actively manage our capacity…"

78.    On the United 2012 third quarter earnings call, Compton reported that "We continued our commitment to capacity discipline in the third quarter as we reduce

consolidated capacity 1.4% year-over-year. Maintaining capacity discipline is core to achieving our goal of generating sustained and sufficient profitability, especially in an environment of sluggish economic growth and elevated jet fuel prices.  And we will continue to be very disciplined in our capacity deployment . . . In September, we also announced a reduction to our 2013 capacity plan. We now expect our full year 2013 consolidated capacity to be down about 1%.  Appropriately matching supply and demand is critical in achieving our long-term return target of 10% on our invested capital, and we are committed to maintaining capacity discipline to help us achieve our goal."

79.     On the 2012 Delta third quarter earnings call, Ed Bastian, President of Delta reported: "For the month of October, we anticipate that our unit revenues will increase 4% to 5%, driven by corporate revenue strength and continued capacity discipline."

80.     On the 2012 US Airways fourth quarter earnings call, J. Scott Kirby President of US Airways in response to a question about international vs. domestic profitability, "I think to your point about is domestic getting better for the industry, domestic, I think, has improved for the industry overall. We started from a higher base and so have improved it at a similar rate. We still have a strongly profitable domestic system, but I think the whole industry has improved. There's been more capacity discipline domestically than there has ever been internationally, and it's much more rational."

81.     On the 2012 United fourth quarter earnings call, Compton reported, "Our full year consolidated capacity declined 1.5% year-over-year in 2012 demonstrating our continued commitment to capacity discipline.  In the fourth quarter, consolidated capacity was 4.2% lower versus 2011. Our approach to capacity deployment remains the same, met supply with demand on a market by market basis…We expect our full year 2013 capacity to decline about 1.5% and expect first quarter capacity to decline between 4.1% and 5.1% year-over-year. We're committed to capacity discipline and achieving our return on invested capital goal."

82.     On the 2012 Delta fourth quarter earnings call, Mary Jane Credeur of Bloomberg News asked Anderson, "Richard, there was a lot of talk at investor day and again today about how significantly Delta has changed its business model and how peers have had a lot of capacity discipline the last couple of years. Is the airline industry model overall fixed?"  Anderson refused to answer the question, at least publically on the earnings call.

83.     On the 2013 US Airways first quarter earnings call in response to an analyst questions about fuel prices, Kirby took the opportunity to tell listeners US Airways was maintaining capacity discipline regardless of fuel prices, "Well, I'm going to always prefer lower fuel prices to higher fuel prices. I know sometimes the analysts write about the silver lining effects of high and volatile fuel prices leading to capacity discipline across the industry, in particular. I think that capacity discipline would stay there, anyway."  Thus, Kirby is stating that the number one cost to airlines has no effect

on capacity, demonstrating that "capacity discipline" was a foregone conclusion for the Defendants as a result of their illegal agreement.

84.     On March 3-5 all Defendants attended the JPMorgan Aviation, Transportation and Defense Conference and were speakers on the same day in the same room.  United Continental Holdings' CEO Jeff Smisek, Ed Bastian- President of Delta, Scott Kirby -President of American and Tammy Romo - CFO & SVP of Southwest represented Defendants.  Smisek directly communicated to his competitors and other conference attendees that, "This is also an industry that has learned the benefits of capacity discipline. Capacity discipline has been very, very good for this business. I think we've all learned from it. Certainly, at United, we've learned from it and we intend to continue our capacity discipline. And as I'll talk about a little bit more today, we're going to continue that capacity and you will see that we have actually shrunk our airline and will shrink our airline, so for the past 3 years, we're actually smaller than we were before.  The stability that consolidation has brought and capacity discipline has brought, that stability permits us to improve our balance sheet and you've seen others and you've seen us de-lever ourselves . . . And we're very, very focused on maintaining our capacity discipline. We have learned that capacity discipline is profit maximizing and you're going to see us continue to do that . . . So we have a lot of flexibility but it's our current intent to keep our [number of airplanes] flat over the next 5 years because capacity discipline works in this business."

85.     On the 2013 United first quarter earnings call, Compton stated, "Our first

quarter consolidated capacity decreased 4.9% year-over-year. This was at the low end of the range we guided to in January, in large part due to higher-than-expected winter storm activity. Capacity discipline remains a key tenet of our strategy…"

86.     On the 2013 US Airways second quarter earnings call in response to an analyst question about revenue growth stated that "capacity discipline" was important to recognize as a driver of airline margins.  Kirby went on to say that cancelling flights was part of capacity discipline.

87.     On the 2013 United fourth quarter earnings call, Compton reaffirmed United's capacity plans, "For the full year, our consolidated capacity declined 1.4% year-over-year. 2013 was the third year in a row where we reduced capacity. Let me assure you that we will continue to be disciplined in how and where we deploy capacity. Over the next 4 years, we expect our consolidated capacity to grow less than GDP."

88.     During the Delta's 2014 first quarter call, JP Morgan analyst Jamie Baker questioned Delta's Seattle expansion, stating that it had made "your owners a bit nervous, as it relates to capacity discipline."  Delta's chief executive, Richard Anderson, responded, "And if you look at our capacity management over the past decade, it's been the most disciplined, and will continue to be the most disciplined." Anderson continued, "And as we said at our annual Investor Day last December, the growth that we are putting in the marketplace today is below GDP estimated growth."

89.     On the 2014 Southwest first quarter earnings call stated that Southwest,

like its competitors would "continue to have a disciplined growth strategy with flat year-over-year ASM capacity in 2014 and at least 2% to 3% seat growth in 2015."

90.    In announcing Delta's 2014 second quarter results, Anderson stated under "Long-Terms Goals" that, "As we look forward to the remainder of 2014 and beyond, Delta will continue to maintain the steady course we have been on, especially our disciplined approach to capacity levels.  This discipline continues to be a key driver of our success as we will post record results for 2014."

91.    On the 2014 United second quarter earnings call, Compton in response to a question about the competitive landscape from John Godyn from Morgan Stanely responded, "I think that the way I think about it from our perspective and a capacity discipline philosophy is that as -- demand is measured by GDP growth faster than capacity."  Later in the call, In response to a question from Mary Jane Credeur about capacity and whether United was risking leaving any business on the table, Compton responded, "Our capacity guidance and philosophy hasn't changed at all. It's geared toward that capacity discipline and making sure that supply and demand are in line . . . But if you look over the long-term, our long view, as John also mentioned, that our fleet count will remain relatively stable over the next 5 years, that our capacity is also going to be very stable. So nothing about our approach to capacity has changed and don't anticipate that to change, given our fleet order and our 5-year plan."  Compton's comments demonstrate that United was not concerned about losing market share due to capacity discipline, an assurance only a member of a cartel could enjoy.

92.     In announcing Delta's 2014 third quarter results, Anderson stated that one of three key areas Delta would "de-risk" going forward was "the continuation of our capacity discipline."  Anderson concluded his remarks, "We'll continue to be disciplined with our capacity and focused on improving our margins and our returns." On the same call, JP Morgan analyst Jamie Baker chastised Delta stating, "But I do have the ability to tell you that when you add capacity…it diminishes shareholder confidence; it suggests a lack of discipline."  Anderson responds by giving a perfunctory nod to antitrust law stating "Look, I mean I think you're in an area that is in some respects not appropriate for an earnings call."  But, rather than stop there, Anderson goes on to reassure investors and competitors that Delta was staying in-line with the industry's "capacity discipline" agreement, "Look at our results.  I don't think there's a more disciplined approach to the deployment of capital in this industry anywhere in the world."

93.     On Southwest's 2014 third quarter earnings call, CEO Gary Kelly offered, "The economy –it's at least in our view – has been more consistent, more stable, driving more confidence and more consistent travel demand. That's showing up. The industry is not adding a lot of capacity as well. So, the supply -demand obviously seems to be, from an industry perspective, in nice balance."

94.     On United's 2014 third quarter earnings call, Compton stated, "The domestic entity continues to display strong demand in the fourth quarter. Continued capacity discipline has supported consistent unit revenue growth in the last several

quarters, and we expect domestic strength to continue into the fourth quarter."

95.     In announcing Delta's 2014 fourth quarter results, Anderson stated, "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014.  Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year."

96.     On United's 2014 fourth quarter earnings call, Smisek stated that costs were no longer necessarily impacted pricing and capacity, "I'd like to take this opportunity to address the recent significant decline in oil prices and its impact on the way we run our business. First we will only grow the airline as demand dictates. The US airline industry has transformed itself over the last several years through consolidation and capacity discipline matching capacity with demand and United will continue its discipline growing capacity less than GDP regardless of the price of oil."

97.     On the same United 2014 4Q call, Bill Green of Morgan Stanley noted the simultaneous capacity discipline signaling throughout the industry, "I wanted to ask about whether you think that the increase in the industry's overall returns will cause the industry domestically to start to lose some of this discipline that you and Delta have both highlighted on their calls as it relates to capacity. Do you worry at all about that, or is that something that you think is not likely to happen given the structure we've got today?" With a perfunctory nod to antitrust laws, Smisek says he will only discuss

United, but goes on to say, "We will absolutely not lose our capacity to split. We found that to be very healthy for us. It's clearly very healthy for the industry, and we're committed to it."  Smisek later contrasts the domestic and international markets, "Well, I do think that the capacity of discipline that has been shown by US carriers is not necessarily shown by international carriers."

98.     In announcing Delta's 2015 first quarter results, Anderson reaffirmed that "We will continue to be disciplined with our domestic capacity levels…" Later in the earnings call Bill Greene of Morgan Stanley asked if there was "any evidence that the industry is losing discipline in your mind or not so much?"  Despite making similar comments about future capacity earlier in the call and elsewhere, Anderson commented that answering would be "just too much commentary on future capacity in the industry."  However, again, rather than leave it at that, Anderson continued "when you look at what we were able to do with capacity plus pricing, it's really pretty remarkable."

99.     On the United 2015 first quarter earnings call Smisek proclaims that, "United has been the industry leader in capacity discipline and as we've shown in the past we'll take the appropriate actions to ensure we are matching capacity with demand. Accordingly, today we reduced our full year capacity guidance by half a point and now expect to grow 1% to 2% in 2015."  Later in the call, Compton in response to a question from Hunter Keay, Analyst at Wolfe Research about competitiveness and capacity, "we are really committed to a disciplined capacity approach, so even the 777 that I talked

about, it will be seat neutral and we'll manage that capacity discipline."

100.    Smisek maintained this view even as the economy improved and in the face of record profits.  He stated in 2015, "We're going to run the airline for profit maximization and we're very focused on capacity discipline . . . We will absolutely not lose our capacity discipline."

101.    More recently, Anderson echoed Smisek's (United's chairman, president, and chief executive) comments above by stating, "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. In fact, we continue to trim capacity on the margin to maintain yields."

102.    American's president, Scott Kirby, confirmed at an investment conference on March 3, 2015, that the company would not be adding capacity via additional airplanes: "Almost all of our capacity growth domestically is about putting more seats on airplanes."

103.    At the same conference, Kirby confirmed that each of the four Defendants were interested in increasing capacity only by way of cramming additional seats onto airplanes:  "All airlines for the most part are putting more seats on airplanes. We're doing it. United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their existing aircraft. Once you've done that, you're done."

104.    Recently, in a June 3, 2015 interview with an IATA publication entitled "Airline Mergers are not easy, but do pay off" American CEO Doug Parker stated that, "We're adding nearly 100 airplanes this year after a similar number last year—almost

two airplanes a week. And we're retiring older aircraft at about the same number so there is not much fleet growth."

105.    Southwest, too, has explicitly signaled its intention to reduce capacity.  As Bloomberg reported, Southwest's chief executive officer, Gary Kelly, said in an interview on June 1, 2015: "We don't want to grow 8 percent, we're not going to grow 8 percent and we can easily trim the schedule to stick to 7 percent [expansion of available seat miles]."

## C.    The Ensuing Capacity Reductions, Increases in Prices and Drops in Oil Prices Resulted in Record Airline Profits

106.    Defendants' efforts to coordinate and signal capacity reductions were successful.  Throughout the Class Period, Defendants collectively kept seating capacity on domestic flights virtually unchanged, despite the increased demand which accompanied the economic recovery.

107.    According to media reports, the average load factor[1] at American has risen to 82% in 2014 from 81.2% in 2010. At United, average load is up from 83.1% to 83.6% over the same period. Delta jumped from 83% to 84.7%, and Southwest has gone up from 79.3% to 82.5%. [http://www.investopedia.com/stock-analysis/070615/doj-investigating-collusion-among-us-airlines-aal-dal-luv-ual.aspx#ixzz3fDcLLJ3K].

108.    In the wake of increased consolidation in the industry, and declining capacity as a result of Defendants' anticompetitive constraints in the face of increasing

---

[1] "Load-factor" is the percentage full for an average flight.

consumer demand, airfares have unsurprisingly increased dramatically.  During the

Class Period, the average inflation-adjusted domestic airfare rose from $354.02 in Q1

2010 to $392.66 by Q4 2014 according to data from the Department of Transportation's

Bureau of Transportation Statistics:



Available at http://www.rita.dot.gov/bts/airfares/national/chart.

109.   At one point in 2014, airfares were up 22%, as against an overall rise in

consumer prices of 12%, according to the Bureau of Labor Statistics.  As the following

chart depicts, airfare increases largely outstripped inflation during the Class Period:



110.    The increase in airfares has been particularly glaring given that costs have decreased dramatically.   Historically, airfare has been tied to the price of fuel, which is the largest operating cost for airlines.  In a competitive market, lower fuel costs should result in lower fares as airlines compete to gain market share.

111.    Defendants capacity reductions have de-incentivized fare reduction, despite the reduction in fuel costs.

112.    As seen in the below chart, jet fuel prices have significantly declined, while the price of domestic airfare has increased:



113.    In tandem with the fare increases, the airlines' have instituted and/or increased fees for checked bags and reservation changes. The airlines are reported to have collected $3.6 billion in bag fees and $3 billion in reservation-change fees in the past two-years.

114.    The combination of higher fares, low fuel prices and imposition of these accessoriral fess has led to record airline profits.  U.S. airlines earned a combined $19.7 billion in the past two years. IATA predicts $30 billion in profits for the airlines in 2015.

115.    Had the airlines been competing, the cost savings due to jet fuel expenses,

would have been passed on to consumers in the form of decreased prices for airline tickets.  Instead, the prices Defendants have charged Plaintiffs and the Class have soared.

**D.      Defendants are Actively Engaged in Numerous Trade Associations, Providing Opportunities to Conspire.**

116.    Defendants are members of the trade association Airlines for America ("A4A"), formerly the Air Transport Association.

117.    The CEOs of each Defendant serve on the board of directors of A4A.  W. Douglas Parker (Chairman and CEO of American Airlines), Richard H. Anderson (CEO Delta Air Lines, Inc.), Gary C. Kelly (Chairman, President and CEO of Southwest Airlines) and Jeffrey A. Smisek (Chairman, President & CEO United Continental Holdings, Inc.) are all on the board of directors. [2] In September 2013, Southwest's Gary Kelley was Chairman of the A4A Board of Directors and United's Jeffrey Smisek was Vice Chairman.

118.    A4A board of directors meetings provided Defendants and co-conspirators an opportunity to discuss capacity and pricing.

119.    As discussed above, Defendants, including their CEOs, are also actively involved in IATA.

120.    Currently, United's CEO, Jeffrey Smisek, and American's CEO, Douglas Parker, represent North America on the IATA Board of Governors.

---

[2] The board of directors also includes select smaller carriers, JetBlue Airways Corp., Alaskan Air Group, and Hawaiian Airline, Inc.

121.    In 2014, Douglas Parker and Delta's CEO, Richard Anderson, represented North America on the IATA Board of Governors.

122.    In 2013, Anderson served as the Chairman of the IATA Board of Governors.

123.    In 2011, Anderson and Gerard Arpey, former Chairman and CEO of American, represented North America on the IATA Board of Governors.

124.    In 2010, Anderson, Arpey, and Glenn Tilton, Former Chairman, President and CEO of United,represented North America on the IATA Board of Governors members.

125.    IATA Board of Governors meetings took place at least twice per year, including at least once prior to the IATA Annual General Meeting. If a board member fails to attend three consecutive meetings, that board member is automatically terminated from the Board of Governors, absent extenuating circumstances.

126.    As discussed above, IATA Board of Governors meetings and conferences provided Defendants and co-conspirators an opportunity to discuss capacity and pricing, which, as demonstrated by statements from the June 2015 IATA Annual Meeting, Defendants took advantage of.

**E.**    **United States Senators Blumenthal and Schumer Call for Investigation of Airlines**

127.    On June 17, 2015, shortly after the New York Times published its article highlighting Defendants' statements at the IATA Annual Meeting, the United States

Senator for Connecticut, Richard Blumenthal, wrote a letter to United States Assistant Attorney General, William Baer, raising concerns regarding anticompetitive conduct by Defendants. With respect to the withdrawal by Southwest of its plan to increase capacity, Senator Blumenthal stated, "[t]he conclusion seems inescapable that the remarks made at IATA were targeted at Southwest and that its capitulation was the result of the 'fire' aimed at the company."

128.   Senator Blumenthal urged the DOJ to investigate collusion in the airline industry stating, "[a]s you know from the Department of Justice's (DOJ's) investigation into US Airways' merger with American Airlines in 2013, most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins. In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling."

129.   Senator Blumenthal's letter went further, citing the DOJ's previous objections raised during its investigation into the US Airways/American merger:

> The Complaint specifically documented the troubling history of US Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively. In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of industry…[The CEO] urged the other executives to, 'portray these guys as idiots to Wall Street and anyone who'll listen.'"

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior…the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

130.    Finally, Senator Blumenthal concluded with a call for the DOJ to act:

I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.

131.    In December 2014, U.S. Senator Charles Schumer from New York called for a federal investigation of U.S. airfares amid falling gas prices stating: "The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather. That is why I urge the DOJ and DOT to immediately investigate why airline profits are not more efficiently being passed down to consumers."

132.    In a statement, Senator Schumer commented, "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity.  So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can

break the bank."

**F.      Department of Justice Investigates Defendants' Collusion and Capacity Discipline**

133.    On June 30, 2015, the U.S. Department of Justice ("DOJ") served Civil Investigative Demands ("CID") on each Defendant requesting information related to capacity and other topics. A spokesperson for the DOJ, Emily Pierce, confirmed the DOJ was investigating "possible unlawful coordination" by Defendants to limit capacity increases, thereby keeping ticket prices high. Each Defendant separately confirmed that it had received a CID from the DOJ.

134.    According to the Associated Press, the CIDs requested documents and information related to copies of all communications the airlines had with each other, Wall Street analysts and major shareholders about their plans for passenger-carrying capacity, or "the undesirability of your company or any other airline increasing capacity."   The DOJ also asked each airline for its passenger-carrying capacity both by region, and overall, since January 2010.

135.    According to the DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation.  In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to believe that an antitrust violation may have been committed." Ch. III § B(1). Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely

defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy.  The greater the potential significance of the matter, the more likely the request to open an investigation will be approved." Id. (emphasis added).

136.   On July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office is conducting a similar investigation into collusive activity among air carriers and had sent letters to Defendants Delta, United, American and Southwest.

## G.   Defendants Have Demonstrated a Pattern of Engaging in Anticompetitive Conduct

137.   Defendants are no strangers to allegations of anticompetitive conduct.  For example, the DOJ complaint challenging the American-US Airways merger stated that, "[t]he structure of the industry is already conducive to coordinated behavior", noting that airlines closely watch each other's fares and match each other's fare increases. As another example, the DOJ pointed to the use of "cross-market initiatives" ("CMIs") to deter fare wars. "A CMI occurs where two or more airlines compete against each other on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market—a CMI— where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts."

138.   United, American and Delta have also resisted the Gulf Carriers entering the US market.  United, American and Delta have lobbied to the government to stop

expansion of Gulf Carriers into the US markets, claiming hypocritically the Gulf

Carriers enjoy government subsidies, despite the U.S. airlines have also benefited

enormously from using Chapter 11 bankruptcies to shed huge legacy costs and

restructure.

139.    Defendants have similarly attempted to curb competition by eliminating

consumers' ability to compare pricing for domestic air travel services.

140.    In a May 19, 2015 report, "Benefits of Preserving Consumers' Ability To

Compare Airline Fares", Dr. Fiona Scott Morton of the Yale School of Management[3]

and R. Craig Romaine and Spencer Graf of Charles River Associates studied

Defendants' efforts[4] to limit consumers' ability to access comparative and transparent

pricing and scheduling information via online travel agent sites ("OTAs") (e.g., Orbitz,

Priceline, CheapOair, Expedia) and metasearch sites (e.g., Kayak, TripAdvisor, Google

Flights, Hipmunk, Skyscanner, or Fly.com) and the resulting increase in fares paid by

consumers – i.e., Plaintiffs and Class members here.

141.    As detailed in the study, at a time when industry consolidation already had

limited competition, Defendants have increased their efforts to restrict access by OTAs

and metasearch sites to their pricing and scheduling information, limiting consumers'

---

[3] Professor Morton is the Theodore Nierenberg Professor of Economics at the Yale School of Management where she has been on the faculty since 1999.  From 2011 to 2012, she served as the Deputy Assistant Attorney General for Economics at the U.S. Department of Justice, Antitrust Division.
[4] For example, between December 2010 and mid-2011, Delta had removed its flights from 21 OTAs, such as TripAdvisor.com, ChepOAir, and Fly.com.  United and American have similarly restricted access to their flight information, and Southwest has historically done so (and continues to do so) as well.

ability to comparison shop, likely "lead[ing] to higher average airfares, increas[ing] consumers' search costs, mak[ing] entry into city-pair routes by smaller airlines more difficult, reduc[ing] transparency, and strengthen[ing] the market power of the major airlines." The study estimates that the potential reduction in net consumer welfare as a result of Defendants' efforts to limit information only to their own websites could exceed $6 billion per year and may result in up to 41 million passengers annually choosing not to fly at all. A conclusion corroborated by testimony given years earlier before the Senate by Northwest's then-CEO Douglas Steenland in support of the proposed Delta-Northwest merger:

> Over the past several years, online sites such as Orbitz, Expedia, and Travelocity have been created to enable customers to compare airline offerings directly. . . . These tools have provided enormous benefits to consumers and have increased the price competitiveness of the airline industry. In fact, there are few businesses in which there is as much pricing transparency.

142. Ironically, despite touting the consumer benefits of these OTAs and metasearch sites when trying to push through the merger, after the merger, as discussed above, Delta and its cohorts wasted no time in trying to eliminate this source of price competition among them, with Delta's CEO going as far as claiming these travel websites should pay Delta to display its "content rather than [Delta] paying them to take our content, because our content is very rich." Delta, however, doesn't provide content, like Netflix for example, it sells airline tickets. As the authors of the study note, "it is difficult to think of an industry that charges consumers for simply viewing their prices and product offerings."

143.    Continental (now United) was a defendant in the Transpacific Air litigation. Northwest Airlines Corporation (now Delta), United, American and Delta were named co-conspirators in the Transpacific Air litigation.

## VIII.    ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

144.    Plaintiff did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to the 2015 comments cited in this Complaint. Prior to Defendants' recent coordinated statements regarding "capacity discipline" at the IATA Annual Meeting in June, and the DOJ's announcement of its investigation on July 1, it was not reasonably apparent that Defendants were each engaged in anticompetitive conduct .

145.    Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs and Class members. These violations constitute injurious acts that restart the applicable statute of limitations each time they are committed.

146.    In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying supracompetitive prices for domestic air travel services throughout the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

147.    Plaintiff and the Class members did not discover, nor could have

discovered through reasonable diligence, that Defendants and their co-conspirators were

violating the antitrust laws until shortly before this litigation was initially commenced,

because Defendants and their co-conspirators used deceptive and secret methods to

avoid detection and to affirmatively conceal their violations.

148.    Neither Defendants nor their co-conspirators told Plaintiffs or other Class

members that Defendants were limiting capacity or engaging in the other unlawful

collusive practices alleged herein. By its very nature, Defendants' and their co-

conspirators' conspiracy was inherently self-concealing.

149.    Defendants further concealed their agreement by making public

statements that competition was vigorous. For example, American Airlines CEO Doug

Parker recently stated, "What we are left with is a highly competitive market, with three

large global network carriers that compete against each other intensely all over the US

and the world, complemented, of course, by Southwest Airlines and airlines such as

JetBlue and Alaska, and by the ultra-low cost carriers such as Allegiant, Spirit, and

Frontier."

## IX.     CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

150.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set

forth herein.

151.    Beginning at least as early as January 1, 2010, the exact date being

unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing

combination or conspiracy to unreasonably restrain trade and commerce in violation of

Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

152.   In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the price of domestic air travel services in the United States.

153.   As a result of Defendants' unlawful conduct, prices for domestic air travel services were raised, fixed, maintained and stabilized in the United States.

154.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

155.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

a.      participating in meetings and conversations to discuss the prices and capacity of domestic seats and flights in the United States;

b.      communicating in writing and orally to fix prices and manipulate the capacity of domestic seats and flights in the United States;

c.      agreeing to manipulate prices and the capacity of domestic seats and flights in the United States sold throughout the world and in the United States, and to allocate  customers of such products, in a manner that deprived direct purchasers of free and open competition;

d.      policing the agreement and coordinating to reduce capacity by

illegally signaling via public calls, interviews and speeches;

e.    issuing price announcements and/or price quotations in accordance with the agreements reached;

f.    selling seats on domestic flights in the United States at non-competitive prices;

g.    providing false statements to explain increased prices for airfare and reduced capacity on domestic flights in the United States

156.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for domestic airfare than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## X.      PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on  behalf of the Class herein, adjudging and decreeing that:

A.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Plaintiffs be designated as the Class  representatives and their counsel as Class Counsel;

C.    Defendants have combined and conspired in a *per se* violation of Section 1 of the  Sherman Act (15 U.S.C. § 1), and that Plaintiffs and Class members have been injured  in their business and property as a result of Defendants' violations;

D.    Plaintiffs and Class members be awarded damages sustained by them,  as

provided by the federal antitrust laws, and that judgment in favor of Plaintiffs and the

Class be entered against Defendants, jointly and severally, in an amount to be trebled in

accordance with such laws;

E.      Defendants and their co-conspirators, including eachs' respective

subsidiaries, affiliates, successors, transferees, assignees and the respective officers,

directors, partners, agents, and employees thereof and all other persons acting or

claiming to act on their behalf, shall be permanently enjoined and restrained from

continuing and maintaining the conspiracy or agreement alleged herein;

F.      Plaintiffs and Class members be awarded pre-judgment and post- judgment

interest, and that such interest be awarded at the highest legal rate from and after the date

of service of the initial Complaint in this action;

G.      Plaintiffs and Class members shall recover their costs of this suit, including

reasonable attorneys' fees as provided by law; and

H.      Plaintiffs and Class members shall receive such other or further relief as

may be just and proper.

## XI.      <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury

of all of the claims asserted in this Complaint so triable.

Dated: July 10, 2015                    Respectfully Submitted,

**GUSTAFSON GLUEK PLLC**

*s/Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)

Michelle Looby (#0388166)
Joshua J. Rissman (#0391500)
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
T: (612) 333-8844
F: (612) 339-6622
E-mail:  dgustafson@gustafsongluek.com
          dhedlund@gustafsongluek.com
          mlobby@gustafsongluek.com
          jrissman@gustafsongluek.com

**ATTORNEYS FOR PLAINTIFFS**